IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 15-23416-cv-GAYLES/TURNOFF

ERVIN GARCIA

      Plaintiff,

v.

NACHON ENTERPRISES, INC.,
and CARLOS NACHON,

      Defendants.

_____/

## NEI'S MOTION FOR SUMMARY JUDGMENT

NACHON ENTERPRISES, INC. ("NEI"), through undersigned counsel, and pursuant to F.R.Civ.P 56(c) and L.R. 56.1, moves for entry of a summary judgment against ERVIN GARCIA ("GARCIA") on behalf of itself and CARLOS NACHON, deceased.[1]  A concise statement of undisputed material facts [2] is filed simultaneously. Exhibits referred to in this motion are found under the tab in the Appendix which accompanies this motion.

### I. Overview of Claims and Defenses

GARCIA' s Amended Complaint contains counts for minimum wages,  overtime pay and retaliation under the Fair Labor Standards Act ("FLSA") and four common law claims for breach of contract, quantum meruit, and unjust enrichment, which are pled as

---

[1]  A suggestion of death was filed on 4/22/16.  GARCIA did not move for substitution of his estate within 90 days of service of the suggestion.  Therefore, the claim against CARLOS NACHON must be dismissed or summary judgment entered in his favor as a matter of law.

[2]  Facts recited in the accompanying Concise Statement of Undisputed Material Facts are being taken as true by NEI only for the purpose of this motion.

alternatives to the federal wage claims.  GARCIA does not contest he held the title General Manager ("GM") at NEI's Ace Hardware store ("the Ace Store") in Hialeah, FL and performed managerial and administrative duties in that position. Rather, he alleges that he falls outside of the exemptions because for a time he devoted nearly 85% of his work time performing manual work during a particular period of time.

NEI asserts that GARCIA's GM position squarely fits into the executive and administrative exemptions because it is uncontested that GARCIA was paid an annual salary of $50,000.00 [3] (equivalent to $961.54 weekly), supervised 2 or more employees, regularly exercised discretion and performed work that was greatly important to the successful operation of the Ace Store even if he concurrently performed some manual tasks as he claims.

## II.  Legal Standards

I.      Standards for Summary Judgment.

The purpose of a summary judgment motion is "...to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).  NEI must either show that GARCIA has no evidence to support his case or present "affirmative evidence demonstrating that GARCIA will be unable to prove its case at trial." United States v. Four Parcels of Real Property, 941 F. 2d 1428, 1437-38 (11th Cir. 1991) (en banc).

While inferences from the evidence must be drawn in favor of GARCIA , he "may not rest upon mere allegations or denials", but "must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 202 (1986); Thompson v. Miami-Dade County, 2009 U.S.

---

[3]      NEI claims that GARCIA was paid $50,000/yr but the difference in fact is immaterial.

Dist. LEXIS 33486 (S.D. Fla. 2009). The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.   The relevant rules of substantive law dictate the materiality of a disputed fact.  Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).

II.    Standards for Executive and Administrative Exemptions

The FLSA exempts from the payment of overtime wages any salaried employee who occupies a bona fide executive/ managerial or administrative position.   29 U.S.C. § 213(a)(1)  An exempt employee must meet both salary and job duties tests.  Avery v. City of Talladega,  24 F.3d 1337, 1340 (11th Cir.1994).   The "job duties" test was created to prevent employers from escaping liability for overtime simply by giving an employee the title of "manager" and putting him or her on a salary.   An employer must prove that a plaintiff's position fits "plainly and unmistakably" within the asserted exemption.  Reich v. Wyoming, 993 F.2d 739, 741 (10th Cir. 1993).

To establish the executive/managerial exemption, an employer must prove that its employee was paid a salary of at least $455 a week; his primary duty is management of the enterprise in which he was employed; he customarily and regularly directed the work of two or more other employees and he had authority to hire or fire other employees or he made suggestions and recommendations regarding hiring, firing, advancement, promotion and any other changes of status of other employees which were given particular weight.   29 C.F.R. § 541.100 and DOL Fact Sheet, #17A at https://www.dol.gov/whd/overtime/fs17a_overview.htm.

If an employee does not meet the executive/ managerial exemption due to lack of supervisory authority, the employee may still qualify as an exempt administrative

employee.  An administrative employee's primary duty must consist of the "performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers" which work requires the exercise of discretion and independent judgment. 29 C.F.R. § 541.201(a). GARCIA's admissions and the testimony and evidence of record show that his position as GM squarely fits into both exemptions.

III.    The Executive/Managerial Exemption

Among the type of duties described by U.S. Department of Labor ("DOL") as managerial are:

> " interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; maintaining production or sales records for use in supervision or control; appraising employee's productivity and efficiency for the purpose of recommending promotions or other changes in status; directing handling their complaints and grievances, disciplining employees; planning the work;…… apportioning the work among the workers;……controlling the flow and distribution of merchandise to be bought, stocked or sold; providing for the safety and security of employees or the property; planning or controlling the budget, and monitoring and implementing legal compliance measures."

29 C.F.R. § 541.102

The term "primary duty" means the principal, main, major or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  29 C.F.R. §700(a).   Factors that are considered include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt

work performed by the employee.  Id.

Numerous DOL regulations address the issue of exempt employees performing manual work.  29 C.F.R. §541.700(c) contains the following example which negates GARCIA's position in this case:

> "Thus, for example, assistant managers [4] in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty *even if the assistant managers spend more than 50 percent of the time performing nonexempt work* such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement."

[E.S.].   29 C.F.R. §541.106, entitled "Concurrent Duties" also provides:

> "(b)   For example, an assistant manager in a retail establishment may perform work such as ***serving customers, stocking shelves and cleaning the establishment***, but performance of such non-exempt work does not preclude the exemption if the assistant manager's primary duty is management.  As assistant manager can supervise employees and serve customers at the same time without losing the exemption.   An exempt employee can also simultaneously direct the work of other employees and stock shelves. "

[E.S.].   29 C.F.R. 541.106(a) actually recognizes that exempt executives *exercise discretion* when they decide whether and when to perform nonexempt duties.   The regulation also recognizes that exempt executives remain responsible for the success or failure of business operations under their management even when performing the nonexempt work.

Therefore, even if GARCIA performed manual tasks during the course of his employment as he claims, this factor alone is not a determinative.  Nor does it matter how much time he spent on non-exempt tasks if his primary duty was management of

---

[4]   The regulation's example is less applicable to GARCIA because he was the General Manager of the Ace Store, not an assistant manager.

the enterprise.  See, e.g., <u>Diaz v. Team Oney</u>, 291 Fed. Appx. 947 (11th Cir. 2008); <u>Donovan v. Burger King  Corp</u>., 672 F.2d 221, 226 (1st Cir. 1982); <u>Byers v. Petro Services, Inc</u>., 110 F. Supp. 3d 1277 (S.D. Fla. 2015); <u>Calvo v. B & R Supermarket, Inc</u>., 63 F. Supp. 3d 1369 (S.D. Fla. 2015); <u>Phillips v. Tacala, Inc.,</u>  883 F. Supp. 2d 1138 (N.D. Ala.2012);; <u>Stein v. J.C. Penney Co.</u>, 557 F. Supp. 398 (W.D. Tenn. 1983) [senior merchandising manager who spent 70-80 percent of his time on non-managerial duties was exempt].

On  the  other  hand,  an  employee's  admission  that  his  primary  duties  are managerial in nature ***is dispositive***.  <u>Brillas v. Bennett Auto Supply</u>,  675 F. Supp. 2d 1164 (S.D. Fla. 2009); [employee admitted his primary function as General Manager was  management] [5] <u>Hicks v. Mercedes-Benz, U.S. Int'l, Inc</u>., 2012 U.S. Dist. LEXIS 91969 (N.D. Ala. 2012)[employees admit their primary function was managerial despite non-exempt work).

Given that GARCIA admits that his primary function was to "run" the Ace Store, there is no need to determine whether and to what degree he performed manual labor. [TAB A., p. 132:18-24].   And GARCIA admits that if he was exempt, then his salary was meant to cover all hours worked. [Id., p. 312:12-22].   N e v e r t h e l e s s , a s s u m i n g GARCIA's  admission  does  not  end  the  inquiry,  the  totality  of  circumstances– as analyzed  by  the  tests  cited  in  29  C.F.R.  §700(a)--  demonstrate  that  GARCIA's characterization of his primary duty as management is correct. [6]

---

[5]   Like the employee in <u>Brillas</u>, GARCIA's subsequent resume' described his duties as GM as managerial. [TAB C(5)].

[6]   There is no dispute that GARCIA was paid more than $455 per week and that he supervised two or more employees. [Id, p. 142:7-9; p. 143].

A.    The Relative Importance of GARCIA's Managerial Duties

The relative importance of GARCIA's managerial duties to the manual work he claims to have performed is amply established by the record.   NEI was not looking to hire either a low level manager or a construction laborer: it needed an individual with considerable experience in retail management and supervision to set up, start up and operate a new division of its business. [TAB B].  GARCIA was recommended to NEI by Mr. Mayorquin of AHS because of his managerial experience and GARCIA, himself, represented to Ms. Nachon that he had the skills to manage a retail store. [TAB C(1)]. Of particular significance to Ms. Nachon in her decision to hire GARCIA was his prior experience setting up operations in AHS's member stores, his knowledge of AHS's proprietary software systems and his prior working relationships with AHS's district management staff. [TAB A, p. 70:1-6; TAB B] – not whether he could swing a hammer.

Both Ms. Nachon and GARCIA's expectations of the GM's duties mirrored each other.   GARCIA understood that the position he was offered would "run" the Ace Store. [TAB A, p. 132:19].   GARCIA believed 'what he brought to the table:"  was experience in   "***supervision, store set up, managerial experience and leadership" skills***. [E.S.]. [ Id, p. 69:24-70:6].   He would not have accepted the position of GM if he did not think he had the managerial experience and leadership capabilities of handling it. [Id., p. 69:1-7]  Indeed, GARCIA believed leadership and the ability to delegate were qualities of a good manager. [TAB A., p.66:24-67:4].

Likewise, Ms. Nachon never expected GARCIA to perform manual labor as part of his GM duties. [TAB B].   That is why GARCIA was tasked with finding and hiring a general contractor and other subcontractors to perform all of the remodeling work and

also why Ms. Nachon assigned a ***non-exempt*** employee named Ramon to assist in the demolition. [Id].Importantly, GARCIA's construction experience was never discussed in the initial interview.   [TAB A, p. 93:19-94:2].

There also was no expectation that GARCIA would ring cash registers, wait on customers, unload incoming merchandise or  stock shelves.  [TAB B].  That is why  the Ace Store hired three employees *at his suggestion*.  See, <u>Ballard v. Dover Wipes Company</u>, 2015 U.S. Dist. LEXIS 57830 (D. Dela. 2015)[there was no expectation at hiring that a highly paid employee would perform manual labor despite her later justification that her facility was understaffed and she had to help]. [7]

From NEI's standpoint, it made no economic sense to have GARCIA – a $50,000.00/yr. employee-- perform construction labor when there was a large construction budget available to transform the Main Building into an Ace Store and $10.00/hr non-exempt employees available to assist in everyday manual tasks,  Yet GARCIA's belief was that it made perfect sense for him to be involved in such work because he was "in charge of things." [Id., p. 131:18].  This exemplifies 29 C.F.R. 106(a)'s recognition that an exempt executive *exercises discretion* when he decides whether and when to perform nonexempt duties.

GARCIA's worth to NEI was his ability to come up with new ideas, to exercise judgment and make decisions that would ensure the economic success of the new Ace Store.  Those skills quickly were put to use as is evident after his hire when he recommended a transition plan to quickly and efficiently rid NEI of its existing inventory

---

[7]  While GARCIA also claims that his store was understaffed, he admittedly helped to decide how many employees NEI should hire.   Understaffing also is belied by GARCIA's testimony that he sometimes supervised up to 20 employees. [TAB A, Garcia Depo, p. 117:15-18; 159:21-22].

and fixtures and temporarily operate and oversee NEI's business from a trailer in the parking lot.   At the same time GARCIA claims to have been shoveling up flooring, he also was:

•     Providing valuable input into the re-design of the Main Store to make it more attractive to customers and showcase Ms. Nachon's Door Department,

•     Finding and vetting possible contractors and subcontractors and determining which would provide the best service and pricing;

•     Helping to decide the appropriate levels of inventory to order and what products would sell and which would not.;

•     Canvassing for new products and new vendors to use;

•     Setting up employment policies, procedures, forms and handbooks; and

•     Preparing a print and electronic marketing plan.

GARCIA may have been knocking down walls, but at the same time he also chose and made arrangements with Work Force to provide applicants for employment. He interviewed potential employees, made recommendations for hire and then trained the new employees.   He set their schedules.

GARCIA also was formulating marketing ideas during the remodeling.  His ideas were designed to raise the visibility of the new Ace Store and draw business from nearly competitors.[8]   As the construction continued,   GARCIA established credit for the Ace Store and assisted the other Divisions in handling cash flow; he was fiscally responsible for the Ace Store and found ways to save money; he negotiated with a new vendor to provide free products for the Ace Store's grand opening and he looked at costs when

---

[8]   GARCIA admitted that he spent a large amount of time working on marketing. [Id., 185:17-23].

hiring vendors. [Id., 138:14-19].

Indeed, the record shows that GARCIA's managerial responsibilities covered the entire gamut of managerial duties listed in 29 C.F.R. § 541.102. He interviewed job applicants [TAB A, p. 119:15-16; 118] and made recommendations for the selection of employees [ Id.].   He trained the new staff [Id., p. 55: 18-25].  He set and adjusted his own and his employee's hours of work [ Id, p. 143:18-21;188:6-7; 209:11-16; 269: 8-25; TAB C (9)].  He maintained production or sales records for use in supervision or control [Id., p. 270:11-20; 271:12-21]; 287:15-23].

GARCIA also appraised employee's productivity [Id., p. 263:15-17].   He recommended changes in status such as the time he terminated an employee when he received a complaint from that employee's co-worker [Id.,144:7-14].  He planned and apportioned the work among his subordinates [Id., p. 275:21-22; 278:14-17; 281:20-24; 283:18-25].  Even when employees did not show up, he had complete control of the facility. [Id., p. 185:24-186: 20].  Employees brought complaints to his attention. [Id., p. 146:16-147:13].

GARCIA controlled the flow and distribution of merchandise to be bought, stocked or sold [Id., p. 121:7-19; 122:5-13; 122:21-123:10; 127:6-128:11; TAB B]. He provided for the safety and security of customers, employees or the property [Id., 168:15-20; 281:25-282:3;  287:15-24; 339:9-20].  He planning and controlled the budget [90:24-91:14; 138:14-19; 170:14-15; 271:12- 272:22]. He helped set prices [Id, p. 145:2-6] and negotiated with vendors [Id., p. 159:18-20]; and he monitored and implemented legal compliance measures. [Id., p. 139: 11-141:4].

GARCIA performed quintessential management duties. Phillips v.Tacala LLC,

883 F. Supp. 2d 1138, 1147-1148, 1153 (N.D. Ala. 2012); Brillas v. Bennett Auto Supply, Inc, 675 F. Supp. 2d 1164 (S.D. Fla. 2009); Posely v. Eckerd Corp, 433 F. Supp. 2d 1287 (S.D. Fla. 2006); Jackson v. Advance Auto Parts, Inc., 362 F. Supp. 2d 1323 (N.D. Ga. 2005).  His performance of supervisory skills was even more important considering there were times when he was the sole manager on duty and had to supervise 20 employees. [Id., p. 117:17-18], see Calvo v. B & R Supermarket, Inc., *supra.*

GARCIA's managerial skills were critical to the success of the Ace Store.  See, e.g., Diaz v. Team Oney, 291 Fed. Appx. 947 (11th Cir. 2008); Grace v. Family Dollar Stores, Inc, 637 F.3d 508 (4th Cir. 2011);Langley v. Gymboree Operations, Inc., 530 F. Supp. 2d 1297 (S.D. Fla. 2008).   In one month alone GARCIA's managerial skills increased sales by $200,000.00.  [TAB A, p. 263:4-10].

B.    The Amount Of Time Spent Performing Exempt Work

29 C.F.R. § 541.700(b) provides in pertinent part:

".... *Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.*"

[E.S.]

The facts of record establish that this regulation is applicable to GARCIA'a duties as GM.   GARCIA estimated that *during demolition of the interior* of the Main Building, he spent about 85% of his time performing manual labor. [Id., 341:22-23].  However, this was only for about **2-3 weeks**. [Id., p. 104: 20-21]. After the Ace Store's grand opening, GARCIA performed substantially less time performing manual tasks. [Id., p.

129:7-11].

However, GARCIA'S testimony establishes that even when he performed manual work, he was always "in charge" of the Ace Store. [Id, p. 81:19-83:4; 86:23-87:1; 105:21-106:11, 131:13-25].   He "multi-tasked." [Id., p.286:20-287:14].    Thus, any manual work GARCIA performed was merely ancillary to his primary duty of management.  See, 29 C.F.R. 542.206; Lovelady v. Allsup Convenience Stores, Inc, 304 Fed. Appx. 301, 305 (5th Cir. 2008); Donovan v. Burger King Corp., 672 F.2d 221 (1st Cir. 1982).   Indeed, GARCIA had so many managerial responsibilities he always was spread "thin." [Id., p. 265:19-266:2; 286:21-287:3].

C.    Relative Freedom from Supervision

GARCIA was *the sole* and highest ranking manager of the Ace Store during his entire employment.  Upon hire, Ms. Nachon worked across the street in the Millwork Building managing the Millwork Division and CARLOS NACHON managed the Building and Construction Materials Division.    While GARCIA initially had daily and weekly meeting with Ms. Nachon for planning purposes, he actually worked without supervision.  He planned his day according to the tasks he had to accomplish. [Id., 86: 23- 84: 18l 237:1-6].

GARCIA made his own schedule.  Some mornings GARCIA arrived at 5:00 a.m. [Id., 87:15].  Other days he ran errands before he got to the store. [Id., 107:10- 110:15]. Still other days he had personal issues, like car problems or meeting at his son's school, which caused him to arrive at work late. [Id., p. 172:7012].    GARCIA had the freedom to leave the Ace Store when he wanted during the day. [Id., p. 158:20; 159:25- 161:2]. He simply informed Ms. Nachon if he would not be in the Ace Store. [Id. p. 177: 10-

183:22; 191:21-25].  Some days, GARCIA made appointments to see vendors during the day [Id., p. 314:9-22] and never came into the Ace Store. [TAB B].

Moreover, even after the Door Department and Ms. Nachon's office was located adjacent to the Ace Store, Ms. Nachon generally left around 3:00 p.m. each day to pick her children up from school.   There also were times when neither CARLOS NACHON or Ms. Nachon were on the premises and  GARCIA was the sole manager of the entire enterprise. TAB B].

GARCIA was not required to punch in or out, like the non-exempt employees. [Id.,p. 141:9-10].   Ms. Nachon never questioned the veracity of GARCIA's explanations about why he was not on time or present at the Ace Store and never docked his pay. All she cared about was that the Ace Store was being properly managed and operated. [TAB B].

D.  <u>The Relationship Between The Employee's Salary And The Wages Paid To Other Employees For The Kind Of Nonexempt Work Performed By The Employee</u>

GARCIA earned $961.50 weekly whereas his subordinates earned between $10.00-$13.00/hr. [TAB B].   Assuming GARCIA performed some of the same duties as his subordinates, such as construction work or stocking shelves, the disparity between their earnings was significant.  If GARCIA's salary were based on a forty hour work week (which is was not), he would have earned more than twice as much as full-time hourly paid associates.  See <u>Jones v. ENSR Corporation</u>., 1997 U.S. App. LEXIS 16404 (6th Cir. 1997); <u>Cobb v. Finest Foods, Inc</u>.  755 F.2d 1148 (5th Cir. 1985) and <u>Moore v. Tractor Supply Co</u>., 352 F. Supp. 2d 1268(S.D. Fla. 2004)[comparing wages and benefits between plaintiff and other employees].

In view of the totality of the facts, summary judgment should be granted in NEI's favor because GARCIA plainly fits into the executive/managerial exemption.

IV.   Administrative Exemption

GARCIA's position of NEI also plainly and unmistakenly fits the administrative exemption.  The same duties catalogued above show that he was involved to a high degree in NEI's internal management and general business operations and that he regularly exercised discretion and independent judgment with respect to matters of significance..   Piscione v. Ernst and Young, LLP, 171 F.3d 527, at 540 (7th Cir. 1999); Brillas, supra at 1170.; Moore, supra; 29 C.F.R. § 541.200(a)

V.   The State Law Claims

GARCIA's state law claims are alternatives to his claims under the FLSA. Therefore, if NEI is entitled to summary judgment on GARCIA's FLSA claims, he cannot prove the state law claims.

VI.   NEI Lacked Notice of most of GARCIA's Claimed Overtime Hours

The term "employ" is defined as "to suffer or permit to work." 29 U.S.C. § 203(g). To "suffer or permit to work" an employer must have knowledge of the work being performed. Allen v. Bd. of Pub. Educ. For Bibb Cty., 495 F.3d 1306, 1314 (11th Cir. 2007).  There is no violation of the FLSA where an employee performs uncompensated work but deliberately prevents his or her employer from learning of it."  Allen, 495 F.3d at 1319.  And, "where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer of the overtime work, the employer's failure to pay for the overtime hours is not a violation of the FLSA. Harvill v. Westward Communs., LLC, 311 F. Supp. 2d 573, 583 (E.D. Tex. 2004).

Assuming GARCIA does not meet either the executive/managerial or administrative exemptions, the record is clear that NEI cannot be held responsible for most of his accrued overtime.   GARCIA admits that he never placed Ms. Nachon on notice that he was working late at night at the Main Store performing construction work. [TAB A, p. 184:10-15].   Indeed, Ms. Nachon had no actual or constructive notice that GARCIA was performing any type of construction or manual work. [TAB B].   From 7/14/14 through 11/15/15, Ms. Nachon worked in a separate building across the street from the Main Store.   She typically left work at 3:00 p.m. everyday to tend to her children

Ms. Nachon also would have no reason to believe that GARCIA was working after-hours at the Main Building since NEI was located in a area of Hialeah which experienced crime.   It was customary for all employees to leave together when the Buildings closed for the evening for their personal safety. [TAB B].

The only manner in which Ms. Nachon would have known GARCIA was working at night was if he notified her of Facebook posts he posted, or he sent her text messages or emails.   [TAB A., p. 184:23-185:12].   Thus, to the extent that GARCIA seeks overtime pay, he is limited to claiming time which he can verify through text messages, email and posted posts on Facebook of which Ms. Nachon was aware.

VII.   Retaliation

In order to state a claim for retaliation under the FLSA,  a plaintiff must plead and prove that he:  1) engaged in protected activity; 2) thereafter suffered an adverse employment action; and 3) but for the protected activity, he would not have suffered the adverse action.   Wolf v. Coca Cola Company, 200 F.3d 1337, 1342-43 (11th Cir. 2000)

Once this burden is met, the employer must then articulate legitimate nonretaliatory reasons for the adverse employment action.   If the employer meets this burden of production, then the plaintiff must establish that the proffered reason is pretextual. Univ. of Tex. Sw. Med. Ctr. v. Nassar,   U.S.  , 133 S. Ct. 2517, 2526, 2534, 186 L. Ed. 2d 503 (2013).

A plaintiff engages in "protected activity" when he protests or complains about an employer's conduct that he reasonably believes is unlawful under the FLSA. Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1388 (11th Cir. 1998).  A complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both the content and context, as an assertion of rights protected by the statute and a call for their protection. Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 17, 131 S. Ct. 1325, 179 L. Ed. 2d 379 (2011).

This element of a plaintiff's claim has an objective and a subjective component; that is, plaintiff "must not only show that he subjectively . . . believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable." Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997). The objective reasonableness of plaintiff's belief is "measured against existing substantive law." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).  A plaintiff need not file a formal complaint to establish "protected activity;" unofficial complaints suffice as long as the objective and subjective requirements are met. EEOC v. White & Son Enters., 881 F.2d 1006, 1011 (11th Cir. 1989).

Here,  NEI is entitled to summary judgment in its favor on Count VI because GARCIA cannot establish any of the elements of a retaliatory discharge.   GARCIA's

Amended Complaint alleges in ¶¶ 17 and 18 that he repeatedly complained to CARLOS NACHON about NEI's "failure to pay overtime wages" and the last time he complained was in July, 2015 when "Defendants terminated him."    GARCIA's testimony, however, does not support these allegations.

Indeed, GARCIA testified that he did not complain about overtime at all but that he was engaging in "whistleblowing."  He described the "whistleblowing" as confronting CARLOS NACHON about paying a person named Fermin in cash and CARLOS NACHON's vulgarity towards employees. [Id., p.324:14-325:5].[9]  However, neither of these constituted protected activities under the FLSA.    First, the FLSA allows an employer to pay employees in cash, see definition of "wages" in 29 C.F.R. §501.3 and 29 C.F.R. 531.27. Second, the FLSA prohibits an employer from "discharging or in any other manner discriminating against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding...:"  29 U.S.C. §215(a)(3).  Thus, GARCIA could not have had either an objective or subjective basis for believing his speech was protected.

Even assuming GARCIA could have established protected activity under the FLSA,  he cannot establish that he suffered an adverse employment action.   GARCIA's text message to Ms. Nachon on 7/18/15 clearly expresses that he is resigning. [TAB C(7)].   He explains that he is resigning because of the way "things are being handled"

---

[9] GARCIA acknowledges that Fermin was not on any schedule [Id., p. 85:15-18] and he thought Fermin was being paid cash because that is what Fermin told him.  [Id., p. 85:4-5].

at NEI and the "level of disrespect." [10]   His decision to resign was tempered and well thought out.  He spoke to his wife [Id., p. 151:20] and consulted Mr. Mayorquin before a final decision. [Id., p. 152:21-25; 153:19-22].

GARCIA's explanation for his resignation changed at deposition.   There he claimed he had been constructively discharged because CARLOS NACHON had the audacity to show him a gun [11] and call him names.  [Id, p. 323:24-324: 12].   While these may be reasons an employee makes a decision to resign,  they are not reasons which are ***protected under the FLSA***.    See, 29 U.S.C. §213(a)(3) *supra*.   Indeed, these reasons would be insufficient as a matter of law to find a constructive discharge.  See, Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001)[pervasive conduct required].  The threshold "is quite high."  Menzie v. Ann Taylor Retail, Inc. 549 Fed. Appx. 891 (11th Cir. 2013). Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)[employees not guaranteed workplaces free of stress]

GARCIA also cannot prove causation since he cannot recall the dates on which his "protected activity" took place and co-relate it to the alleged poor treatment. Vague, non-specific testimony cannot defeat entry of summary judgment.   Treat v. American Furniture Warehouse, 2008 U.S. LEXIS 12970 (D. Colo. 2008)[ plaintiff's vagueness as to dates prevents a jury issue]   Compare, Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001).

And finally, even assuming GARCIA could establish a prima facie case of

---

[10]   GARCIA also described that he also complained to CARLOS NACHON about using curse words over the P.A. system, objecting to him telling vendors they would not be paid and "just being disrespectful overall.".  [Id., p. 149:22 -150:7].

[11]   GARCIA cannot recall when the alleged gun incident took place.  [Id., 148:7-18].

retaliation,  he cannot establish pretext.   See <u>Beltrami v. Special Counsel</u>, 170 Fed. Appx. 61 (11th Cir. 2006). To show that the stated reason is pretext for unlawful retaliation, the plaintiff "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." <u>Vessels v. Atlanta Independent School System,</u> 408 F.3d 763, 771 (11th Cir.2005) (quotation omitted); see also <u>Rioux v. City of Atlanta, Ga.</u>, 520 F.3d 1269, 1278 (11th Cir.2008) ["The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons."].

Much like the scenario in <u>Beltrami</u>,  GARCIA had been warned repeatedly about the amount of work time he was taking off and was under pressure to have better attendance.   [TAB C (7)].   GARCIA's text messages to Ms. Nachon with a variety of excuses why he was not at work show there was a valid basis for CARLOS NACHON's "disrespect."     While NEI denies there was any basis for GARCIA to quit,  this dispute doe not preclude entry of summary judgment in NEI's favor. <u>Perez v. Brands Mart Serv. Corp.,</u> 2011 U.S. Dist. LEXIS 82708 (S.D. Fla. 2011).

Conclusion

GARCIA' s admission and the totality of the circumstances demonstrate that GARCIA's primary duties–and the ones which were most valuable to NEI--were managerial.   GARCIA participated in every aspect of management as defined in 29 C.F.R. 541.102.  He was the highest ranking managerial employee of the Ace Store and sometimes the only manager in the entire enterprise.   GARCIA regularly exercised

independent judgment and considerable discretion and enjoyed a great degree of independence in his role as GM.    Indeed, the scope of the unbridled authority and discretion he exercised at NEI is summarized in the resume' he created when he had decided to leave NEI. [TAB C(1)].    Being that management was his primary duty, it is irrelevant how much time he spent performing manual tasks.

The record amply demonstrates that GARCIA's value to NEI and the Ace Store was performance of executive and administrative functions, which ultimately had more effect on the efficient operation of the Ace Store's success than his ability to use tools or stock shelves.  For these reasons, the Court should enter summary judgment against GARCIA and in favor of NEI concluding that he was an exempt employee.    A finding of exemption negates GARCIA's claims for overtime, minimum wages, and his state court claims.

Furthermore, NEI is entitled to summary judgment in its favor on GARCIA's retaliation claim under the FLSA since he cannot prove he engaged in protected activity, that he suffered an adverse employment action, that there is a causal connection or that NEI's continuing concerns about his attendance and continued absenteeism were pretextual.

Respectfully Submitted,

LANGBEIN & LANGBEIN, P.A.
Counsel for NEI
8181 NW 154th Street, Suite 105
Miami Lakes, FL 33016
Tel:  (305) 556-3663
Fax: (305) 556-3647

By:   /s/  Leslie W. Langbein
        Leslie W. Langbein, Esq.
        Fla. Bar No. 305391

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was filed electronically on 8/12/16 through CM/ECF and that a copy of the foregoing will be served via notification through CM/ECF on all counsel or parties of record on the attached service list:

By:   /s/ Leslie W. Langbein
Leslie W. Langbein, Esq.
Fla. Bar No. 305391

**<u>SERVICE LIST</u>**

Peter Hoogerwoerd, Esq.
REMER & GEORGES-PIERRE, PLLC.
44 West Flagler Street
Suite 2200
Miami, Fl 33130
Tel: (305) 416-5000
Fax: (305) 416-5005
email: jremer@rgplaw.com
Counsel for the GARCIA


Leslie W. Langbein
LANGBEIN & LANGBEIN, P.A.
8181 NW 154th Street, Suite 105
Miami Lakes, FL 33016
Tel: (305) 556-3663
Fax: (305) 556-3647
email: langbeinpa@bellsouth.net
Counsel for Defendants