UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-23416-GAYLES

**ERVIN GARCIA,**
           **Plaintiff,**

v.

**NACHON ENTERPRISES, INC.;**
**CARLOS NACHON; and**
**ACE HARDWARE CORP. (DELAWARE),**
           **Defendants.**
_____/

**NACHON ENTERPRISES, INC.,**
           **Counter-Plaintiff,**

v.

**ERVIN GARCIA,**
           **Counter-Defendant.**
_____/

## ORDER

**THIS CAUSE** comes before the Court on Defendant Nachon Enterprises, Inc.'s ("NEI") Motion for Summary Judgment [ECF No. 70], filed on behalf of itself and Defendant Carlos Nachon, deceased.[1] Plaintiff Ervin Garcia brings claims against the Defendants alleging unpaid wages and retaliation, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, as well as supplemental state law claims alleging breach of agreement, quantum meruit, and

---

[1] Federal Rule of Civil Procedure 25(a) provides: "If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Fed. R. Civ. P. 25(a)(1). On April 22, 2016, NEI filed a Suggestion of Death, notifying the Court that Carlos Nachon died on March 16, 2016 [ECF No. 51]. Because there has been no motion for substitution and more than ninety days have passed, the action shall be dismissed as against Carlos Nachon.

1

unjust enrichment.[2] These claims arise from the Defendants' alleged failure to pay overtime wages throughout Garcia's employment with the Defendants in 2014 and 2015. The Court has carefully considered the parties' briefs, the record in this case, and the applicable law, and is otherwise fully advised in the premises. For the reasons that follow, NEI's motion for summary judgment shall be granted.

**I.    BACKGROUND**

    **A.    *Factual History***

        **1.    NEI's Operational Structure and Garcia's Hiring**

NEI is a company that sells hardware and building construction materials from its location in Hialeah, Florida. NEI had two operational divisions: Carlos Nachon managed the Building and Construction Materials Division until his death in March 2016; his daughter, Vice President Priscilla Nachon managed the Millwork Division. The Millwork Division and Ms. Nachon's office were located in a separate building (the "Millwork Building") across the street from NEI's principal building (the "Main Building").

In 2014, NEI purchased a membership in the Ace Hardware Stores network ("AHS"). NEI planned to operate a new Ace Hardware Store (the "Ace Store" or the "Store") in the Main Building, which necessitated a remodeling of the Main Building. AHS assigned District Manager Ramon Mayorquin to guide NEI and Ms. Nachon through the set-up process. Mayorquin and Ms. Nachon agreed that NEI should hire a General Manager for the new Ace Store at the outset. Mayorquin suggested Plaintiff Ervin Garcia as a candidate, as he had previous experience working for an AHS subcontractor. When Garcia and Ms. Nachon met to discuss the General Manager position, Ms. Nachon explained that NEI was seeking someone with significant retail and management

---

[2]  All claims against the remaining Defendant, Ace Hardware Corp. (Delaware), were dismissed upon joint motion of the parties on January 27, 2016 [ECF No. 38].

experience to be responsible for all aspects of the set-up, start-up, and operation of the Ace Store, including budget, personnel, finances, banking, marketing, purchasing, inventory, and vendor and consumer relations. Moreover, she explained that the General Manager would be responsible for formulating new ideas for the Store. Garcia presented Ms. Nachon with a resume that listed his past managerial positions in retail operations. He also represented that he was familiar with AHS's proprietary operational software systems and previously had worked with AHS's district staff (including Mayorquin), and he represented that he possessed managerial skills and experience and leadership capability. Ms. Nachon offered Garcia a starting salary of $49,000, and he accepted. Garcia admitted that he never would have accepted the position of General Manager if he thought he did not have the managerial and leadership skills to perform it. He testified that the "brought to the table" his experience in "supervision, store set up, managerial experience, and leadership" skills. Pl.'s Dep. 69:24-70:6.

### 2. Garcia's Duties Prior to the Opening of the Ace Store

Garcia began working for the Defendants on or about July 7, 2014. His first project as General Manager was to prepare a transition plan to rid NEI's existing hardware inventory and store fixtures, gut and remodel the Main Building, and furnish it as the Ace Store. Garcia was given a budget to accomplish these tasks. He planned the new layout, appearance, and furnishing of the interior of the Store. He suggested painting the outside of the Main Building, installing new signage and creating a logo to give it a younger, fresher appearance. Garcia selected a sign contractor and ordered a new sign for the front of the Store.

Garcia and Ms. Nachon discussed moving NEI's door sales department from the Millwork Building into the Main Building as part of the remodel. Garcia's layout also apportioned space next to the new Store to relocate Ms. Nachon's office and a work area for her sales staff.

Garcia recommended that an auction be held to quickly sell NEI's existing inventory and

3

store fixtures in order to advance the remodeling. Ms. Nachon agreed. Garcia suggested names of potential auctioneers to Ms. Nachon, who ultimately selected the auctioneer to hire. The two worked together to plan the auction.

Garcia suggested that NEI lease, set up, and use a trailer as a temporary store to handle on-going business during the remodeling phase, and Ms. Nachon agreed. Garcia obtained quotes and recommended a vendor to use, and Ms. Nachon again agreed. Garcia managed this temporary store and supervised the employees who worked there while he helped remove the old store fixtures.

Garcia canvassed and took bids from local contractors for the remodeling of the Main Building. He made recommendations to Ms. Nachon regarding which vendors to hire, and Ms. Nachon hired those vendors. Ms. Nachon also agreed with Garcia's suggestion that NEI's construction budget could be conserved if NEI employees helped perform some of the demolition work. As part of this demolition work. Garcia recommended dumpster vendors that would hold and haul away debris and Ms. Nachon agreed. Garcia was NEI's liaison to contractors. He oversaw work performed by NEI's employees and outside contractors to ensure that that work was of sufficient quality.

During this period of time, Garcia continued to work with AHS regarding the set-up and start-up of the Ace Store. He was in constant communication with Mayorquin and Ms. Nachon discussing products, fixturing, layout, promotions, and AHS's programs. Garcia and Ms. Nachon met daily to discuss implementation of Mayorquin's directives for set-up and start-up, as well as other operational issues. They also met weekly to discuss the remodeling and status of the budget. Ms. Nachon continued to operate the Millwork Division from the Millwork Building and Mr. Nachon continued to manage the Building Construction Materials Division.

Garcia and Ms. Nachon believed that certain items in AHS's core inventory would not sell well. Garcia suggested carrying other types of merchandise in the Ace Store, such as colored

4

mulch. Ms. Nachon agreed and the two discussed these ideas with Mayorquin. Garcia contracted with a new vendor to carry its mulch products and, in the process, negotiated for NEI to be provided free bags of mulch for the Store's grand opening. Garcia comparison-shopped competitors to determine pricing for non-AHS merchandise the Store would carry. He and Ms. Nachon discussed and determined mark-ups. Garcia communicated with and met with existing NEI vendors to consider new lines of merchandise to carry in the Store. He also contracted and interviewed potential new vendors, like Yeti Cooler and a tankless water heater company. Garcia recommended NEI contract with the new vendors and carry new merchandise from established vendors in the Store. Ms. Nachon agreed. Garcia then communicated with those vendors and set up credit accounts.

Garcia oversaw the set-up of the Ace Store by AHS's subcontractor to ensure everything went as planned. Garcia recommended the Ace Store's hours of operation and how many employees to hire. Ms. Nachon agreed with both recommendations. Garcia suggested using Work Force, a state employment agency, to find employees. He called applicants and interviewed them, and Ms. Nachon sat in on some of these interviews. Garcia recommended to Ms. Nachon the best candidates to hire and Ms. Nachon agreed. Garcia then trained the new Ace Store employees on AHS's software and sales systems.

Setting up the Ace Store involved manual labor, as well. Garcia asserts that between July and November 2014, he spent the majority of his working hours performing manual labor, doing construction and renovation work including pulling up flooring, replastering, and painting.

### 3.  Grand Opening of the Ace Store

The Ace Store's grand opening was planned for November 15, 2014. As the date grew closer, Garcia met with Ms. Nachon to discuss publicity of the grand opening and activities and opening day specials the Ace Store should offer. Garcia recommended the distribution of flyers, placement of ads in Spanish language newspapers, and hiring of a Latin radio station to be present

5

on opening day. He also told Ms. Nachon that it was common practice for Ace Hardware Stores to conduct drawings or giveaways on opening day. With the exception of hiring a radio station, Ms. Nachon agreed with these suggestions.

### 4. Garcia's Duties after the Opening of the Ace Store

After the grand opening, Garcia performed substantially less manual labor. He continued to handle marketing for the Store, and his marketing plan had an overall positive effect on drawing customers to the Store. Garcia suggested and NEI purchased a hot dog stand to attract customers away from NEI's chief competitor, Shell Lumber, and as a convenience for customers.

Garcia directly supervised the Store's employees, assigned their hours, and coordinated his schedule with theirs. He gave the employees instructions, such as to stock and straighten the shelves, place merchandise and displays, and run errands. He delegated responsibilities, including opening and closing the Store and making bank deposits. Garcia ensured that the employees delivered high levels of customer service, since that is what set the Store apart from big box retailers like Home Depot. He monitored the employees' compliance with AHS's customer service standards. He also handled customer relations and dealt with customer orders, requests, and complaints. His personal cell phone number was listed on his business card, and Store customers could contact him directly. He approved or disapproved the acceptance of returned merchandise. Garcia sometimes oversaw all of NEI's employees, including those in the Millwork Division and Rebar Department if neither Mr. Nachon nor Ms. Nachon was present, and on these occasions he supervised as many as twenty employees. Garcia enforced all employment policies and procedures. He recommended use of an employee handbook and created a new hire packet. He recommended that NEI post FLSA and OSHA posters. He kept track of his subordinates' work hours. At the end of each pay period, he reviewed their timecards and calculated their hours. Garcia, unlike his subordinates, never clocked in and out, and he understood that his position did not require him to punch in.

Garcia had access to the Ace Store's security video on his cell phone. He physically walked the Store to monitor its orderliness and cleanliness and looked for hazards to the safety of employees or customers. As General Manager, Garcia was in charge of inventory and monitored it on a daily basis. He personally handled re-orders of stock in the Ace Store and he also delegated that task. He had the ability to override AHS's suggested levels of inventory and he did so. He also had the discretion not to order core inventory items. He simply presented inventory orders to Ms. Nachon for her signature.

Garcia prepared reports that tracked sales, revenue, profits and losses, and accounts payable. He received and reviewed invoices from vendors and determined when they would be paid, while being mindful of cash flow. He instituted policies and procedures to monitor and control shrinkage. In one month he improved sales by $200,000.

### 5. Garcia Resigns from His Employment with NEI

Garcia took issue with the way Mr. Nachon ran his business. He contends that Mr. Nachon was aggressive and hostile toward employees, including Garcia, and called Garcia derogatory names at work. Furthermore, Mr. Nachon kept a gun on his desk at the office, and, on one occasion, pulled his gun out in front of Garcia when Garcia complained to him about his paying employees under the table and treating employees poorly. Garcia resigned from his employment via text message sent to Ms. Nachon on July 18, 2015.

### B. *Procedural History*

The Defendants removed this case from the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, on September 10, 2015 [ECF No. 1], and Garcia amended his Complaint on October 2, 2015 [ECF No. 9]. In the Amended Complaint, Garcia brings claims to recover alleged unpaid overtime and minimum wage compensation from the Defendants pursuant to the FLSA. *Id.* He also brings claims for retaliation under the FLSA, as well as state law

7

claims for breach of contract, quantum meruit, and unjust enrichment. *Id.* On November 4, 2015, NEI counterclaimed against Garcia, alleging breach of fiduciary duty and conversion. Garcia moved to dismiss the counterclaims, but the Court denied that motion on March 18, 2016 [ECF No. 18]. NEI filed the instant motion for summary judgment on August 12, 2016. The motion has been fully briefed and is ripe for determination.

## II.   LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. —, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted); *see also Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

An issue is "genuine" when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (citations and internal quotation marks omitted). "Where the material facts are undisputed and all that remains are questions of law, summary judgment may be granted." *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122, 1138 (11th Cir. 2016).

The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333

(11th Cir. 2014). However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

### III.   DISCUSSION

#### A.   *FLSA Overtime Claim*

The FLSA provides that employers must pay employees at a rate of one-and-one-half times their regular rate of pay for each hour worked in excess of forty hours per week. 29 U.S.C. § 207(a). However, the FLSA contains exemptions to this overtime requirement. For present purposes, the overtime requirement does not apply to executive or administrative employees. 29 U.S.C. § 213(a)(1). NEI argues that Garcia falls under either of these exemptions.

An employer asserting that such an exemption applies bears the burden to establish it by clear and affirmative evidence, *Calvo v. B & R Supermarket, Inc.*, 63 F. Supp. 3d 1369, 1378-79 (S.D. Fla. 2014), and courts are instructed to narrowly construe the exemptions, *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995) (per curiam). An employee working in an executive capacity means an employee

(1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;
(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
(3) Who customarily and regularly directs the work of two or more other employees; and
(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a). In his opposition to NEI's motion, Garcia disputes only whether his "primary duty" was management of the enterprise; the Court therefore presumes that he does not dispute that NEI has satisfied the other three elements and will focus only on the second element of

9

this test.

Garcia was employed by NEI has the General Manager of the Ace Store; that said, "title is not dispositive of his primary duty." *Byers v. Petro Servs., Inc.*, 110 F. Supp. 3d 1277, 1281 (S.D. Fla. 2015). "Instead, the Court must examine the surrounding facts to determine whether [Garcia's] 'most critical duties to the enterprise were his exempt managerial duties.'" *Id.* (quoting *Rutenberg v. Boynton Carolina Ale House, LLC*, No. 09-80409, 2010 WL 135100, at *3 (S.D. Fla. Jan. 8, 2010)). "An employee's 'primary duty' is determined based on all of the facts in a particular case, with emphasis placed upon the character of the employee's job as a whole." *Calvo*, 63 F. Supp. 3d at 1381 (quoting *Langley v. Gymboree Operations, Inc.*, 530 F. Supp. 2d 1297, 1300 (S.D. Fla. 2008)). Department of Labor regulations guide the Court's examination into whether an employee's "primary duty" is management:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. The regulations also provide a list of factors to consider when determining whether the employee's "primary duty" was management:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. . . .
>
> The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will gener-

> ally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion. . . .
>
> Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

*Id.* § 541.700. And moreover:

> Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met. Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700. Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive. . . .

*Id.* § 541.106(a).

Upon consideration of these factors, as well as the undisputed facts of this case, the Court finds that Garcia's primary duty while employed at NEI was unquestionably managerial in nature. "[N]umerous courts have held that when considering the question concerning whether management was an employee's 'primary duty,' a more useful question is whether or not the employee's managerial duties constituted the primary value the employer placed upon the employee." *Calvo*, 63 F. Supp. 3d at 1381 (quoting *Brillas v. Bennett Auto Supply, Inc.*, 675 F. Supp. 2d 1164, 1168 (S.D. Fla. 2009)). It is clear to the Court that Garcia's managerial duties constituted the primary value that Ms. Nachon—and accordingly NEI—placed upon Garcia.

11

Prior to the opening of the Ace Store, Garcia managed a budget. He planned the new layout, appearance, and furnishing of the Store. He provided recommendations to Ms. Nachon regarding contractors and vendors, which she relied on, and he sometimes hired vendors on his own. He liaised between NEI and AHS regarding the set-up and start-up of the Store. He suggested carrying new and different types of merchandise in the Store. He, along with Ms. Nachon, determined price mark-ups. He oversaw the set-up of the Store by AHS's contractor. He recommended using an employment agency to find employees. He called and interviewed applicants, sometimes without Ms. Nachon present. He recommended applicants to hire. He trained new employees.

After the opening of the Store, he directly supervised the Store employees (and sometimes employees in other departments when Mr. Nachon or Ms. Nachon were away). He set employee hours. He gave employees instructions on assignments to do throughout the day. He delegated responsibilities, including opening and closing the Store and making bank deposits. He monitored the employees' compliance with AHS customer service standards. He enforced employment policies and procedures. He kept track of and calculated hours, and reviewed employee time cards. He monitored the order and cleanliness of the store. He was in charge of inventory and monitored it daily. He often overrode inventory levels suggested by AHS. He had the discretion to decline to order core inventory items. He drew up inventory orders on his own to provide to Ms. Nachon for her sign-off. He tracked sales, profits, losses, and accounts payable.

Reviewing these duties, the Court finds it obvious that Garcia's "most critical duties to the enterprise" of NEI were his managerial duties. *Byers*, 110 F. Supp. 3d at 1281 (citation omitted).

Garcia argues that he does not fall under this exemption because during periods of his employment—mostly prior to the Store's opening—he spent as much as eighty-five percent of his time performing non-managerial work, including demolition, reconstruction, flooring, and stocking shelves. He contends, therefore, the amount of time he spent performing work is a genuine issue of

12

material fact that precludes summary judgment.

The Court disagrees. At the outset, the fact that Garcia performed a significant amount of non-exempt tasks at all is not alone dispositive. *See Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287, 1302-03 (S.D. Fla. 2006) ("The case law is replete with decisions holding managers of retail establishments to be exempt, notwithstanding the fact that they spent non-exempt tasks or their need to obey corporate policies and/or follow the orders of their corporate supervisors."). And again, the Court emphasizes that "the analysis for the 'primary duty' test should not focus on whether [a p]laintiff spent most of his time on managerial duties; the test should focus on whether [the p]laintiff's managerial duties constituted the ***primary value*** [the d]efendants placed on [the p]laintiff." *Altman v. Sterling Caterers, Inc.*, 879 F. Supp. 2d 1375, 1383 (S.D. Fla. 2012) (emphasis added); *see also Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1272-79 (S.D. Fla. 2004) (finding an employee exempt even though he spent ninety percent of his time on nonexempt work), *aff'd*, 140 F. App'x 168 (11th Cir. 2005) (per curiam).

Garcia testified that the performed this manual work because he was "in charge of things" ("things" meaning the set-up of the Ace Store prior to the grand opening). The Department of Labor regulations contemplate that an exempt employee will concurrently perform exempt and non-exempt work, explaining that "exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work." 29 C.F.R. § 541.106(a). Because Garcia was "in charge" of the set-up of the Store, he exercised his discretion to engage in the manual labor, yet at the same time he remained responsible for the set-up of the Store as the General Manager. Garcia makes much of his engaging in manual labor, but he admitted that he performed significantly less manual labor after the opening of the store in November 2014, so the large majority of any manual labor he performed is confined to the pre–grand opening period of time

13

(July through November 2014). But during this time, he was concurrently performing all of the exempt, managerial tasks the Court outlined above. "[W]here [p]laintiffs down-play and minimize the importance of their positions, testifying that they spent most of their time performing routine non-managerial jobs, the courts have tended to reject such post-hoc efforts to minimize the relative importance of managerial duties." *Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1334 (N.D. Ga. 2005) (citations, internal quotation marks, and alterations omitted). This Court will similarly reject Garcia's post-hoc efforts to characterize himself as a mere construction worker or stock-boy in light of the litany of managerial duties he himself has admitted to performing.

Garcia also argues that he did not possess "discretionary powers" because while he had input into certain decisions, NEI had the final say. Pl.'s Opp'n at 6. But the record shows that he, for example, independently researched vendors and contractors and independently interviewed potential employees. He brought his recommendations to Ms. Nachon, who nearly unfailingly adopted those recommendations. The fact that NEI, as the employer, had so-called "final say" in these decisions does not render Garcia discretion-less in his managerial duties. Garcia has provided no authority to the contrary, nor could he, lest no manager employed by, for example, a retail corporate entity could ever be found to be exempt. *Cf, e.g.*, *Posely*, 433 F. Supp. 2d at 1298-1309 (finding that plaintiffs, who were managers employed by a retail pharmacy chain that operated drug stores in twenty-three states, were bona fide executive employees).

Finally, Garcia argues that he did not have a "relative freedom from direct supervision" (one of the factors to consider in determining whether his primary duty was management), 29 C.F.R. § 541.700, because he "was monitored by Defendants twenty-four (24) hours a day and seven (7) days a week." Pl.'s Opp'n at 8. As an initial matter, unless Garcia was a permanent resident of the Ace Store, this is an absurd assertion. Furthermore, the assertion has no basis in the record. He bases this assertion in his brief on the following exchange in his deposition:

14

> Q. Was [sic] there video cameras in the store, security?
>
> A. There was [sic] video cameras, yes.
>
> Q. Okay, and was—were you able to monitor that on your telephone?
>
> A. That's correct.
>
> Q. So would it be possible that Priscilla was monitoring your attendance by using the security system on, looking at on her phone [sic]?
>
> A. Correct . . . .

Pl.'s Dep. at 168:15-23. In this passage, Garcia describes the Store's security system (to which he also had access to view via cell phone). Yet in his brief, he attempts to turn the *possibility* that Ms. Nachon could view *the security cameras at the Store* at any time from her cell phone into the *certainty* that she monitored Garcia's every movement, "twenty-four (24) hours a day and seven (7) days a week." Pl.'s Opp'n at 8. This dubious claim is insufficient to withstand summary judgment, and regardless, only addresses one factor out of an extensive list that the Court must consider. The record reflects that Garcia was the highest-ranking manager at the Store during his employment. The only NEI employees who outranked him (Ms. Nachon and Mr. Nachon) managed other divisions in different buildings. He was not required to punch in or out, unlike the other Store employees, and he set his own schedule, also unlike the other Store employees.

Based on the foregoing, the Court finds that Garcia's primary duty was management of the enterprise. Given that Garcia does not dispute any of the other elements of this test, the Court concludes that Garcia was "employed in a bona fide executive . . . capacity" within the meaning of the FLSA and is thus an employee exempt from the overtime provisions of the FLSA. Accordingly, NEI's motion for summary judgment on the Plaintiff's FLSA overtime claims is granted.[3]

**B.   *State Law Claims***

"As a matter of law, [a] plaintiff cannot circumvent the exclusive remedy prescribed by

---

[3] Because the Court has found that Garcia is exempt under the executive/managerial exemption, it need not address NEI's argument that he also falls under the administrative exemption.

Congress in asserting equivalent state law claims in addition to the FLSA claim." *Morrow v. Green Tree Serv'g, L.L.C.*, 360 F. Supp. 2d 1246, 1252 (M.D. Ala. 2005) (quoting *Tombrello v. USX Corp.*, 763 F. Supp. 541, 545 (N.D. Ala. 1991)). Specifically, where a plaintiff's state law claims are merely the FLSA claims recast in state law terms, those state law claims are preempted by the FLSA and summary judgment may therefore be granted. *Alexander v. Vesta Ins. Grp., Inc.*, 147 F. Supp. 2d 1223, 1240-41 (N.D. Ala. 2001). Garcia's state law claims for breach of agreement, unjust enrichment, and quantum meruit are each phrased as state-law versions of his FLSA overtime claims. *See, e.g.*, Am. Compl. ¶ 23 (breach of agreement) ("Defendant . . . fail[ed] to pay the amount due to Plaintiff for services provided and performed under their agreement, and [did] not properly pay[] Plaintiff for all hours worked . . . ."); *id.* ¶ 29 (quantum meruit) ("Defendants retain an inequitable benefit from Plaintiff by not properly paying Plaintiff for all hours worked . . . ."); *id.* ¶ 35 (unjust enrichment) ("Defendants unjustly benefit from the services performed and provided by Plaintiff by not properly paying Plaintiff for all hours worked . . . ."). Thus, NEI's motion for summary judgment is granted.

  **C.**  *FLSA Retaliation Claim*

The FLSA makes it unlawful for any person

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act, or has testified or is about to testify in any such proceeding or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3). To prevail on a claim for retaliation under the FLSA, a plaintiff must first establish a prima facie case, which requires a showing that "(1) []he engaged in activity protected under [the] act; (2) []he subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000). If the plaintiff succeeds in stating this prima facie

16

case, the employer must then articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x 820, 822 (11th Cir. 2008). Then, if the employer meets this burden of production, "the plaintiff may attempt to show pretext." *Wolf*, 200 F.3d at 1343.

A plaintiff engages in statutorily protected activity when he or she protests an employer's conduct that is unlawful. *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998). In addition, a plaintiff engages in statutorily protected activity when he or she protests "an employer's conduct which is actually *lawful*, so long as he or she demonstrates 'a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Id.* (emphasis added) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). A plaintiff "must not only show that he subjectively . . . believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable." *Little*, 103 F.3d at 960.

In his Amended Complaint, Garcia's allegations supporting his retaliation claim read as follows:

> 17. Throughout Plaintiff's employment, Plaintiff regularly and repeatedly complained to Defendants, including but not limited to Carlos Nachon, and/or objected [to] the Defendants' failure to properly pay overtime wages.
> 18. The last time Plaintiff complained about his wages was when Defendants terminated him in July of 2015.
> 19. Defendants, including Carlos Nachon, knew or should have known that Plaintiff's complaints regarding improper payment of wages was protected activity under the FLSA.
> 20. Defendant, Carlos Nachon, who had operational control of the Defendant's business, made the ultimate decision to terminate Plaintiff.

Am. Compl. ¶¶ 17-20. However, when questioned about his retaliation claim at his deposition, Garcia testified as follows:

> Q. Okay, so what are you claiming is the retaliation in this case?

17

> A. Retaliation comes into effect of the whistleblowing [sic], and to the fact that I believe that [Mr. Nachon]—
>
> Q. The whistleblowing of—
>
> A. Yes, because I had confronted him about paying people, such as Fermin and others, under the table, and the fact that I confronted him in regards to the fact of him being very vulgar with the employees [sic].
>
> Q. Okay, so your—so your claim is that what statute was violated?
>
> A. Whistleblowing.
>
> Q. Yeah, under the whistleblower statute, you have to name a statute that has been violated.
>
> A. I leave that to my lawyer.
>
> Q. Well, you haven't pled it in your complaint, so I guess now is the time for me to find that out.

Pl.'s Dep. at 324:14-325:8. At that point, counsel for both parties discussed Garcia's proposed motion to amend to the complaint to add claims for civil RICO, whistleblower, unfair trade practice, and retaliation claims against the Defendants. Garcia filed such a motion on May 25, 2016 [ECF No. 60], but the Court, following a hearing on the motion, denied the motion on May 31, 2016, finding that (1) Garcia had not shown good cause as to why the Complaint should be amended beyond the deadline provided in the Scheduling Order and (2) the Defendants would be unduly prejudiced by the amendment [ECF No. 62].

It is axiomatic that "[w]hen a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must 'go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.*, 103 F. Supp. 3d 1343, 1349-50 (S.D. Fla. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986)). And Garcia himself states that "[t]he plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the em-

ployer is a pretext for prohibited retaliatory conduct." Pl.'s Opp'n at 11 (citing *Goldsmith v. Bagby Elev. Co.*, 513 F.3d 1261, 1272-74 (11th Cir. 2008)). Yet Garcia argues that he "routinely complained about Defendants' conduct, and the last straw was when Defendants failed to pay Plaintiff for the hours he worked by docking his pay. This resulted in Defendants constructively discharging Plaintiff." *Id.* at 11-12. But because Garcia has proffered no evidence that he, as he alleges in the Amended Complaint, "regularly and repeatedly complained to Defendants . . . and/or objected [to] the Defendants' failure to properly pay overtime wages," he may not rely on this allegation as support for his retaliation claim. Thus, the only evidence Garcia *has* proffered in support of the position that he engaged in protected activity is a generalized statement that he "routinely complained about Defendants' conduct," *id.* at 11 (although he does not state what exactly this "conduct" consists of), and testimony that he confronted Mr. Nachon about "paying people, such as Fermin and others, under the table" and about "being very vulgar with the employees," Pl.'s Dep. at 324:20-24.

First, "[g]eneral work grievances do not give rise to FLSA anti-retaliation actions," *Barquin v. Monty's Sunset, L.L.C.*, 975 F. Supp. 2d 1309, 1313 (S.D. Fla. 2013), so Garcia's "routine complaints," or his specific complaint about Mr. Nachon's vulgarity do not establish that he engaged in protected activity *under the FLSA*. And second, even assuming *arguendo* that Garcia subjectively believed that NEI paying certain employees in cash was unlawful, he has provided no evidence to show that that belief was *objectively* reasonable. The objective reasonableness of a plaintiff's belief that an employer's action is unlawful is "measured against existing substantive law." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). "In applying this 'objective reasonableness' test, the Eleventh Circuit has held that, where courts have concluded that an employer's conduct is lawful, a plaintiff's belief that his employer engaged in an unlawful employment practice was not 'objectively reasonable,' and the plaintiff's complaints therefore

19

did not qualify as 'protected activity.'" *Baker v. Supreme Beverage Co.*, No. 13-0222, 2014 WL 7146790, at *7 (N.D. Ala. Dec. 15, 2014). Payment in cash for work is unquestionably a lawful activity, *see* 29 C.F.R. § 501.3 (defining "[w]ages" as "[a]ll forms of cash remuneration to a worker by an employer in payment for personal services"); *see also id.* § 531.27 (explaining, in section titled "**Payment in cash or its equivalent required**," that "sections 6 and 7 of the [FLSA] require payments of the prescribed wages, including overtime compensation, *in cash or negotiable instrument payable at par*" and that section 3(m) of the FLSA "permits and governs the payment of wages *in other than cash*" (emphases added)). Given that, Garcia's belief that NEI's activity was unlawful—based on his limited testimony that NEI was paying some employees in cash—without more is objectively unreasonable. He therefore has failed to establish that he engaged in statutorily protected activity, which necessarily means that he cannot establish a prima facie case of retaliation under the FLSA. Accordingly, NEI's motion for summary judgment on this claim is granted.

**IV.   CONCLUSION**

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

(1)   all claims against Defendant Carlos Nachon are **DISMISSED**; and

(2)   Defendant Nachon Enterprises, Inc.'s Motion for Summary Judgment [ECF No. 70] is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 23rd day of November, 2016.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE